Filed 7/13/26  RMB Real Estate Investments 2 v. Cal. Capital Ins. Co. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| RMB REAL ESTATE INVESTMENTS 2, LLC,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>CALIFORNIA CAPITAL INSURANCE COMPANY,<br><br>　　　Defendant and Appellant. | A170466<br><br>(Sonoma County<br>Super. Ct. No. SCV267840) |

After the 2017 Tubbs fire destroyed a Santa Rosa apartment complex owned by respondent RMB Real Estate Investments 2, LLC, RMB submitted claims to its insurer, appellant California Capital Insurance Company (CCIC).  CCIC agreed to cover losses incurred in the first two years following the fire, but it denied coverage for certain lost "business income" incurred after that two-year period.  RMB sued, and a jury awarded it the amount it claimed it was owed under the policy, along with attorney fees, prejudgment interest, and punitive damages.  CCIC argues on appeal that the trial court misinterpreted the terms of the policy, that various aspects of the verdict are not supported by substantial evidence, and that the award of punitive

damages must be reversed.  We reduce the award of punitive damages, but we otherwise reject CCIC's arguments and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Brandon Broll is a professional apartment investor who owns a corporation that manages RMB.  RMB was formed in 2012 to purchase a 72-unit apartment complex in Santa Rosa.  The complex was built in 1970 and, although some of its features were grandfathered into existing law, the property was not in compliance with modern building codes.

Broll secured insurance for the complex through CCIC.  The policy version at issue became effective on November 7, 2016.  The policy spans nearly 90 pages, and the parties agree it covered loss for fire damage.

After the complex was destroyed by the Tubbs fire, CCIC reimbursed RMB's claims for the first two years, and RMB accepted that the amount paid was sufficient.  Their dispute centers on whether certain costs incurred after the two-year period were covered by two different provisions in the policy that covered lost "Business Income."  One of these provisions covered claims under an "increased period of restoration" clause, and the other covered claims under an "extended business income" clause.  As to the "increased period of restoration" clause, CCIC contends that it afforded no coverage whatsoever beyond the two-year period.  As to the "extended business income" clause that became effective after RMB resumed operations, CCIC agrees that it owed some, but not all, of what RMB sought.

The length of the policy, and the ways in which it cross-references and amends definitions relevant to these clauses, prevent a simple, concise summary.  Section A of the policy, titled "Coverage," states that CCIC will pay for direct physical loss or damage to the property, and it then defines

what this coverage does (and does not) include. Section A.5. of the policy ("Additional Coverages") lists various expenses the policy covers in the event of a covered loss. One such expense is "Business Income" (section A.5.f.).

The "Business Income" section in the main policy has two subparts (before the enhanced coverage described below). The parties have no disputes about the first subpart (section A.5.f.(1)). It defines business income to include: (1) "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses" and (2) "[c]ontinuing normal operating expenses incurred, including payroll." The section also provides, "We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to the property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss." The section also includes a time limitation: "We will only pay for loss of Business Income that you sustain during the 'period of restoration'[1] and that occurs within 12 consecutive months after the date of direct physical loss or damage" (a time period that is expanded in the enhanced coverage discussed below).

The parties' first dispute involves the second subpart (section A.5.f.(2)), titled "Extended Business Income." This section provides coverage for the

---

[1] "Period of restoration" is defined elsewhere in the policy as beginning 72 hours after the loss and ending on the date when the property should have been repaired.

period after operations resume but there is still ongoing loss of business income. It states that CCIC "will pay for the actual loss of Business Income" incurred starting when operations resume and ending 180 days after operations are resumed. Thus, this provision provided coverage untethered to the two-year period, as it covered claims for six months starting with the resumption of operations.

A section titled "CIG PROPERTY PLUS" that provides enhanced coverage appears around 40 pages later in the policy. This enhanced coverage both amends and adds to the "Business Income" section. It increases the time limit in section A.5.f.(1) (regarding lost business income during suspended operations) from 12 months to "24 consecutive months after the date of direct physical loss or damage." Three subparts are added to the "Business Income" section, and the parties' second dispute is about one of them: A.5.f.(3) "Increased Period of Restoration." This clause provides in full, "The limit of insurance that applies to coverage under this endorsement includes any loss arising from any increased period required to repair or reconstruct the property to comply with the minimum standards of any ordinance or law, in force at the time of the loss, that regulates the construction or repair, or requires the tearing down of any property."

With those policy provisions in mind, we return to the history of this case. The apartment complex was completely destroyed by the Tubbs Fire in October 2017. Even the foundation could not be used again since testing revealed it was unusable. Broll met with an architect around a week after the fire to discuss rebuilding. He first thought he would rebuild the same number of units (72), on the same footprint, similar to what was on the property before the fire. But the architect told Broll he would need to consider a different plan in order to comply with new ordinances and laws.

Broll met with a Sonoma County supervisor, who told Broll he wanted to help bring housing back as soon as possible. The county asked Broll to add additional units, and by the end of November 2017 RMB submitted a site plan with 96 apartment units. The county in March 2018 (within five months of the fire) approved RMB's plan with several mandatory conditions of approval to comply with modern construction requirements. For example, the county required RMB to make public improvements to the area surrounding the apartment complex by adding sidewalks, curbs, gutters, a bike lane, a bus stop, and streetlights. The county required that these improvements be made before any units could be occupied.

A dispute arose in August 2019 when Broll claimed costs associated with complying with RMB's obligations to pay for public improvements on the property, which "seemed to be slowing [his] project down in bits and pieces." Broll considered the "increased period of restoration" clause to "perfectly cover the delay of [his] project." In response to a question over whether the policy would cover Broll's increased costs, his CCIC representative responded that the increased coverage was subject to a 24-month time limit. Broll disagreed with that interpretation and wrote the CCIC representative again, but the representative did not respond. Broll reached out to the representative on several other occasions, but the representative again did not respond.

On January 7, 2020, Broll spoke with the representative, who apologized for not responding sooner and told Broll he would call Broll every Friday with updates. But the representative did not call on either of the following two Fridays. And the representative likewise did not respond to an email Broll sent on January 31.

The first phase of rebuilding was completed by May 2020, and RMB was able to resume operations. Although only 16 units had been completed by that time, the leasing office had opened and the complex began marketing apartments for rent. May 2020 serves as a dividing line for the types of coverage RMB sought. Costs incurred from October 2019 (the 24-month mark after the fire) to the beginning of May 2020 comprised RMB's claim under the policy's "increased period of restoration" coverage. Included in these expenses was the cost of interest on the short-term construction loan RMB had to take out in order to rebuild the property. Broll made a claim for these expenses in mid-June 2020, but he did not immediately receive a response. As we have mentioned, CCIC has consistently maintained that coverage under the "increased period of restoration" clause was limited to 24 months after the fire.

May 2020 was also the beginning of a "ramp-up period" for renters to sign leases and actually move into the apartments. Broll claimed expenses from May to the end of October 2020 under the policy's 180-day "extended business income" clause. CCIC agreed it was required to reimburse RMB under this clause, but it did not reimburse the full amount claimed. On June 9, Broll wrote to his CCIC representative and made a demand for his extended business-income loss he had already incurred, but he did not immediately receive a response. His CCIC representative eventually sent a calculation of RMB's loss, which Broll "found very surprising, if not shocking," because it included projections even though RMB had provided specific figures. Broll later testified that "projections aren't credible if actual is available." He sent two more follow-up messages to his CCIC representative in July but did not receive a response.

RMB on July 30, 2020, filed a complaint against CCIC with the Department of Insurance because Broll "was getting frustrated with not getting a response." Around a week later, Broll received a response from CCIC stating that the request for costs related to the increased period of restoration was denied since they were not incurred within 24 months of the fire.

After receiving additional occupancy permits, RMB had 32 units available for rent in early August 2020. The company continued to have business-income losses, and Broll sent CCIC income statements regarding them. Broll and CCIC disagreed about how much was owed on those losses. By early September, RMB had 48 units available to lease. Broll considered this a "magic" number of units, since he "projected that actually just under 48 units, [he] would no longer have a business income loss," even though he was at that point operating fewer units than before the fire (72). He clarified that RMB's actual income level from before the fire had not returned. Broll later testified that "[a]ll my claims ended on November 1. There was no longer a business income loss."

Broll in September 2020 made another demand for coverage for both extended-business income and increased period of restoration, but he did not immediately receive a response. His CCIC representative emailed him on October 1 telling Broll that CCIC had paid RMB everything that was owed. Broll later provided "all the actual financial information," which was his final calculation. At that point he "had great hope that actual information would be incorporated" into what CCIC would pay. CCIC provided a report in mid-November that, according to Broll, contained at least "two substantial calculation errors," in that it assumed there were five people living on the property who were not actually there and it assumed $1,000 more in rent

than what was actually received.  Broll spent hours looking at CCIC's projections and calculations to document what he identified as errors.[2]  He again wrote to CCIC demanding the entire claimed amount for extended business-income loss.

In December 2020 Broll had a scheduled phone call with his CCIC representative and two forensic accountants.  Before the phone call, he was hopeful that he could work through what was perhaps a miscommunication about their different figures.  He was "shocked" that the CCIC representatives immediately brought up "COVID adjustments," which "confused" Broll because he "knew that COVID didn't affect the property."  Broll followed up after the meeting with an email and a voicemail to his CCIC representative, but he did not receive a response.

RMB hired an attorney in January 2021.  The attorney wrote a demand letter for both the increased period of restoration (for which no payment had been made) and for the remaining extended business-income loss (for which only a partial payment had been made).  CCIC did not respond to the demand letter.

RMB filed its lawsuit in February 2021.  The case was resolved in two phases.  In the first phase, the trial court decided the legal issue of whether the "increased period of restoration" clause was limited to claims incurred in the two-year period.  The trial court sided with RMB and concluded that the clause did not place a time limit on coverage for costs incurred in complying with legal minimum construction requirements.

---

[2] CCIC ultimately corrected the amount of rent that was actually collected, but Broll maintained that the company's calculations continued to include an error in an equation and also projection errors.

The matter proceeded to a jury trial (phase two). Various experts testified for both RMB and CCIC. Jurors concluded that CCIC was liable for breach of contract and awarded RMB $1,947,235 in damages, the total amount RMB claimed it was underpaid.[3] They further concluded that CCIC had breached the implied covenant of good faith and fair dealing, and awarded RMB $304,822 in attorney fees[4] and $74,945.72 in prejudgment interest. The jury also concluded that CCIC had acted with malice, oppression, or fraud, and awarded RMB $6.5 million in punitive damages.

CCIC filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for a new trial, both of which the trial court denied.

## II.
### DISCUSSION

### A. *The Plain Meaning of CCIC's Policy Did Not Place a Time Limitation on Claims Related to Complying with Construction Codes.*

CCIC renews its argument that the "increased period of restoration" clause limited coverage for complying with modern building codes to 24 months after the fire. We are not persuaded.

" 'As a question of law, the interpretation of an insurance policy is reviewed de novo under well-settled rules of contract interpretation.' [Citation.] ' " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citation.] Thus, 'the mutual intention of the parties at the time the contract

---

[3] The trial court awarded $666,063.80 in prejudgment interest on this contract loss.

[4] The attorney fees were recoverable under *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 (*Brandt*), which authorizes attorney fees as an element of damages where an insurer's tortious withholding of policy benefits compels an insured to retain an attorney to seek those benefits.

is formed governs interpretation.' [Citation.] If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.] If the policy language is 'clear and explicit, it governs.' " ' " (*Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (2024) 15 Cal.5th 1106, 1135–1136.)

"The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists." (*Id.* at pp. 18–19.)

The "Business Income" coverage contained in section A.5.f. of the policy, including the provisions in the enhanced "PROPERTY PLUS" coverage, may be summarized as follows. CCIC will pay for the following five items: (A.5.f.(1)) the actual loss of business income that occurs within 24 months; (A.5.f.(2)) the actual loss of business income incurred beginning on the date the property is repaired and operations resume and ending 180 days thereafter; (A.5.f.(3)) an increased period of restoration required to repair or reconstruct the property to comply with minimum standards of any current ordinance or law; (A.5.f.(4)) the loss of business income or extra expenses (up to $25,000) caused by the interruption of services to the premises; and (A.5.f.(5)) loss of business income or loss of rents (up to $100,000) for newly acquired structures, up to 60 days after the acquisition of the structures. Put plainly, the policy enumerates various business expenses that CCIC will cover in the event of property damage. Some of those

expenses have time limits, but the coverage for costs incurred in complying with current building laws (the "increased period of restoration" clause in section A.5.f(3)) does not.

All of CCIC's arguments to the contrary are essentially attempts to have the court strain to find an ambiguity where none exists. (*Waller*, *supra*, 11 Cal.4th at pp. 18–19.) The company points to the provision that covers lost business income—which indisputably is capped at 24 months. But loss for complying with current construction laws contains no such time limitation.

True enough, as CCIC notes on appeal, the basic policy defines the term "Period of restoration" as excluding "any increased period required due to the enforcement of any ordinance or law that: [¶] . . . [r]egulates the construction, use or repair, or requires the tearing down of any property." But then the "PROPERTY PLUS" section of the policy *adds* a section that covers loss related to just such compliance. And to make it abundantly clear that there is no time limitation, the enhanced section *excludes* the reference to complying with ordinances that regulate the construction of property. It is thus unnecessary to consider CCIC's policy interpretation that tries to harmonize the definition of "Period of restoration" in the basic policy with the definition of "Increased Period of Restoration" in the enhanced portion of the

policy,[5] since the enhanced coverage *excludes* the very definition CCIC relies on. CCIC acknowledges that " '[e]ndorsements on an insurance policy form a part of the insurance contract [citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole.' " (*Regional Steel Corp. v. Liberty Surplus Ins. Corp.* (2014) 226 Cal.App.4th 1377, 1391, quoting *Narver v. California State Life Ins Co.* (1930) 211 Cal. 176, 181.) Yet it does not address the deletion of the definition it relies on.

CCIC's reliance on another section of the policy supports affirming the trial court's conclusion. The basic policy provides that CCIC will cover "Extra Expense" (expense incurred to minimize suspension of business and continue operations), but only for such expenses that are incurred within 12 months after the covered event. The enhanced coverage adds a provision that covers expenses incurred in order to comply with construction laws in effect at the time of the loss (analogous to the provision at issue), and such extended coverage is increased to 18 months. CCIC claims this "language confirms that the parties intended to apply time limits to the amounts that could be recovered during the 'increased period of restoration,' with the limits being 24 months for Business Income and 18 months for an Extra Expense." To the

---

[5] The basic policy's definition of "Period of restoration" excludes time to comply with "any ordinance or law" regulating construction. The "Increased Period of Restoration" is more specific and covers the period to comply with "any ordinance or law, *in force at the time of the loss*" that regulates construction. (Italics added.) CCIC claims this means that the basic coverage is for restoring the property to comply with building codes in effect at the time of the building's original construction, and the increased period covered the extra time (up to 24 months) to comply with more modern codes. (E.g. *Breshears v. Indiana Lumbermens Mut. Ins. Co.* (1967) 256 Cal.App.2d 245, 248 ["[O]ne of the traditional concepts of fire insurance . . . is to indemnify or compensate the insured for the actual loss which he has sustained and not necessarily to place him in a better position than he was in at the time of the fire."].)

contrary, it demonstrates that CCIC knew how to draft a provision with a time limitation, and such a time limitation is conspicuously absent in the increased period of restoration for business income.

This court issued a tentative opinion explaining why we disagreed with CCIC's appellate arguments. In response to it, CCIC advanced yet another interpretation of the policy at oral argument. It argued that the "Increased Period of Restoration" clause does not specifically say it will "pay" for an expense, but instead states that "[t]he *limit of insurance* that applies to coverage under this endorsement includes any loss arising from any increased period required" to comply with modern standards. (Italics added.) We deem this argument forfeited because it was not raised in CCIC's briefing, and it fails on its merits anyway. We reject the notion that the clause can be interpreted to limit coverage, as it appears under the heading "A.5. *Additional Coverages.*" (Italics added.) And in any event, CCIC has failed to show with any reasonable particularity how losses sustained during any increased period exceeded applicable coverage limits.

In short, because there was no time limit for coverage provided under the "Increased Period of Restoration," we reject CCIC's interpretation of its policy.

### B. CCIC Has Not Established Legal Error in the Award of Damages for Breach of Contract.

CCIC next argues that "RMB failed to prove it was entitled to recover additional business income losses under the Extended Business Income provision." (Boldface omitted.) The company contends that "RMB failed to present any evidence at trial that it suffered a recoverable loss under this provision." In its reply brief, the company clarifies that "[f]or purposes of this appeal, CCIC is not disputing that RMB did, in fact, incur all of the claimed

expenses," but instead it "is challenging the trial court's erroneous legal interpretation of the 'Extended Business Income' provision." We are not persuaded.

Broll testified that operations resumed in May 2020 when RMB had 16 units available to rent. As of August, there were 32 apartments ready for rent and occupancy, but Broll testified that RMB continued to suffer business income loss. An accountant who testified as an expert in damages calculations testified for RMB that he compared operations assuming the fire never occurred to the actual performance of the property from October 2017 through October 2020. These included the estimated rental income RMB would have, but did not, collect because of the fire, as well as the different expenses incurred because of the fire. These expenses included those to market the property after it was rebuilt, as opposed to those incurred when the property was fully leased before the fire.

RMB sought these expenses under the "extended business income" clause. Again, that clause provides that that CCIC would pay for the actual loss of "Business Income" that RMB incurred beginning when operations resume and ending 180 days after operations resume. "Business Income" is defined as the net income that would have been earned absent property damage and the "[c]ontinuing normal operating expenses incurred, including payroll."

According to CCIC, these policy provisions "entitled RMB to recover the net income it lost as a result of the fire, plus the amount of 'continuing normal operating expenses' it incurred during the 180-day ramp up period. Therefore, to be entitled to recover any specific expenses under this provision, RMB had to prove that the expense was a 'continuing normal operating expense,' i.e. that the expense predated the fire." In other words, CCIC

apparently contends that the definition of a "[c]ontinuing normal operating expense[]" necessarily includes only those types of expenses that RMB incurred before the fire. As RMB notes, CCIC has not previously argued this definition of a normal operating expense.

Jurors were instructed that if they found that CCIC was liable for breach of contract, they had to decide how much to award in damages. As relevant to CCIC's appellate argument, jurors were told that RMB had to prove (1) it suffered a business-income loss during the 180 days related to extended business income, (2) CCIC was notified of the loss, and (3) the amount of covered loss that CCIC failed to pay. The instruction did not provide that jurors had to determine what was a "normal operating expense" under the policy. As CCIC does not challenge the jury instructions on appeal, it is unclear why the company now argues that RMB did not prove something that jurors were not asked to determine. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 [where party to civil lawsuit claims substantial evidence does not support verdict but asserts no error in jury instructions, sufficiency of evidence is measured against jury instructions].) It claims in its reply brief that it is "irrelevant" that there were no jury instructions on the issue since "it would have been improper to instruct the jury to decide the meaning of this provision given that the construction of an insurance policy is a question of law for the court." But that just emphasizes RMB's point that CCIC has not previously asked that a court interpret the policy provision the way it urges us to do so on appeal.

True, RMB's damages expert acknowledged on cross-examination that there was "a big dispute" over whether various costs were "operating or not operating" expenses, and he included in his calculations all costs that were in the operating statements provided to him. But jurors were permitted to

credit his testimony, and CCIC does not point to any evidence that contradicts the expert's methodology.

Nor does CCIC point to any specific costs that should have been rejected by the jury (with the exception of mortgage interest, discussed below). CCIC contends that the expert's calculation of the amount of loss was "faulty" because it totaled more each month than RMB received in net business income each month in the year before the fire. Stated differently, the damages expert calculated that RMB was owed $220,418 each month during the six-month ramp-up period, which was around $170,000 more than the company received in net business each month in the year before the fire. According to CCIC, "RMB could not suffer a business income loss greater than the income it received before the fire; one cannot lose something that it never had. Accordingly, the Court should reverse this portion of the judgment." Again, though, CCIC does not identify how the jury's conclusions were inconsistent with the jury instructions that the company does not challenge on appeal. And as RMB responds, "An insurer does not put the insured in the position that the insured would have been but-for the fire by ignoring ongoing post-fire expenses and paying only former net profits."

CCIC identifies one specific expense that it claims should not have been included in damages: the mortgage interest RMB paid for a construction loan. RMB's damages expert included in his calculation the interest paid on a construction loan that was in excess of the mortgage payment that would have been paid had the fire not occurred.

CCIC first contends that if we accept its argument that RMB's "increased period of restoration" damages were capped at 24 months, we should reject the mortgage payments since Broll testified that the payments

were claimed under this provision. As we have previously rejected this time limitation, we reject this argument as well.

Second, CCIC argues that the mortgage payments were not a recoverable "normal continuing operating expense" under the extended business-income provision. Since the loan was taken out after the fire, CCIC reasons, payments on it "did not qualify as 'continuing normal operating expense[s]' as a matter of law." But CCIC does not cite any legal support for this argument, nor does it cite any evidence (such as expert testimony) that such expenses were not recoverable under the policy. In reply, it clarifies that "whether the interest on [the] loan qualified as a 'normal continuing operating expense' " was "a question of law," again without specifying where it asked the trial court to define it as such.

Finally, CCIC notes that it reimbursed RMB for interest on the construction loan under a different provision of the policy, up to the 18-month limit in that separate provision.[6] Without further analysis, CCIC argues, "Therefore, RMB was not entitled to recover any additional mortgage interest expenses under any of the provisions of the policy." This undeveloped argument does not overcome the presumption of correctness of the jury's verdict, and we reject it.

In short, we decline CCIC's invitation to set aside the verdict on RMB's breach-of-contract cause of action.

---

[6] The payments were made under a provision called "Extra Expense," which defined the expense as one that is incurred (1) to avoid or minimize the suspension of business and to continue operations, (2) to minimize the suspension of business if operations cannot be continued, or (3) to repair or replace any property.

*C. Substantial Evidence Supports the Jury's Verdict on the Cause of
Action for Breach of the Implied Covenant of Good Faith and Fair
Dealing.*

CCIC also contends that we should reverse the judgment on RMB's
cause of action for violation of the implied covenant of good faith and fair
dealing. RMB contends, and CCIC disputes, that CCIC's opening brief
presents a one-sided view of the facts that fails to comply with the California
Rules of Court and caselaw. It argues that CCIC has thus forfeited its
substantial-evidence challenges (including the challenge to punitive
damages). We are sympathetic to this argument. And, as we highlight
below, there are areas where CCIC fails to carry its appellate burden to show
error. We decline, however, to find wholesale forfeiture, since courts favor
determining appeals on the merits.

We thus proceed " 'with a determination as to whether there is any
substantial evidence, contradicted or uncontradicted,' to support the findings
below. [Citation.] We . . . view the evidence in the light most favorable to the
prevailing party, giving it the benefit of every reasonable inference and
resolving all conflicts in its favor in accordance with the standard of review so
long adhered to by [California] court[s]." (*Jessup Farms v. Baldwin* (1983)
33 Cal.3d 639, 660.)

As the jury was instructed, every insurance policy contains "an implied
obligation of good faith and fair dealing that neither the insurance company
nor the insured will do anything to injure the right of the other party to
receive the benefits of the agreement." (CACI No. 2330; see *Jonathan Neil &
Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 937.) To fulfill this obligation, an
insurance company must give at least as much consideration to the insured's
interests that it gives to its own. (CACI No. 2330; see *Jonathan Neil* at
p. 937.) As set forth in the jury instructions, "To breach the implied

obligation of good faith and fair dealing, an insurance company must unreasonably act or fail to act in a manner that deprives the insured of the benefits of the policy. To act unreasonably is not a mere failure to exercise reasonable care. It means that the insurer must act or fail to act without proper cause. However, it is not necessary for the insurer to intend to deprive the insured of the benefits of the policy." (CACI No. 2330.)

Jurors also were instructed that in order to find that CCIC breached the obligation of good faith and fair dealing by failing to pay benefits due under the insurance policy, RMB was required to prove all of the following: (1) RMB suffered a loss under the insurance policy, (2) CCIC was notified of the loss, (3) CCIC unreasonably failed to pay policy benefits, (4) RMB was harmed, and (5) CCIC's failure to pay policy benefits was a substantial factor in causing RMB's harm. (CACI No. 2331.) Jurors were further instructed that "[t]o act or fail to act 'unreasonably' means that the insurer had no proper cause for its conduct. In determining whether [CCIC] acted unreasonably, you should consider only the information that [CCIC] knew or reasonably should have known at the time when it failed to pay policy benefits." Jurors were told to consider CCIC's conduct as a whole and that they could consider as factors whether CCIC did any of the following: (1) misrepresented to RMB relevant facts or policy provisions, (2) failed to acknowledge and act reasonably promptly after it received RMB's claims, (3) failed to accept or deny coverage within a reasonable time, (4) did not try in good faith to reach a "prompt, fair, and equitable settlement" of RMB's claim "after liability had become reasonably clear," (5) required RMB to file a lawsuit by offering substantially less than what was recovered at trial where RMB made a claim for an amount close to what was ultimately recovered, or

(6) failed to promptly provide a reasonable explanation for denying a claim. (CACI No. 2337.)

On appeal, CCIC at first appears to sidestep the substantial evidence standard of review when it argues that the trial court "erred in allowing RMB's bad-faith claim to go to the jury and in failing to grant CCIC's motion for judgment notwithstanding the verdict on this claim." In other words, CCIC seems to suggest that it was entitled to judgment on RMB's bad-faith claim *as a matter of law*, despite the fact that conflicting evidence was presented on the issue of bad faith.

First, since no legal question is at issue, CCIC is incorrect insofar as it contends that we review de novo the denial of its motion for JNOV, as the case it relies on makes clear. (*Zirpel v. Alki David Productions, Inc.* (2023) 93 Cal.App.5th 563, 573 [JNOV may only be granted where no *substantial evidence* supports the verdict]; see also *Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782 [on appeal from denial of JNOV, appellate court reviews record de novo and makes "independent determination whether there is *substantial evidence* to support the jury's findings"], italics added.) CCIC's heavy reliance on *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335 (*Chateau*) is thus misplaced, since it involved the grant of summary judgment on a claim for an insurer's conduct where the evidence was undisputed. (*Id.* at pp. 344, 346.)

CCIC fares no better on the merits. It does not focus heavily on the factors set forth in CACI No. 2337. Instead, the company claims it cannot be liable since there was a "genuine dispute" over coverage. "[B]efore an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*. [Citations.] However, where there is a

*genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." (*Chateau, supra,* 90 Cal.App.4th at p. 347.) "[A]n insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." (*Ibid.*) "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723.)

In support of its argument that insufficient evidence supports the verdict, CCIC points to favorable testimony and documents presented below and characterizes it as "undisputed evidence" that there was a genuine dispute over coverage. But the company ignores the testimony of an attorney with nearly three decades of experience in insurance work who testified for RMB as an expert in insurance coverage and the standard of care with respect to handling and adjusting insurance claims. The expert opined that CCIC's interpretation of the policy covering the extended period of restoration was "per se unreasonable and therefore not in compliance with the obligations of the insurance company given that it failed to comply with the [policy's] plain language." The expert explained that an insurance policy is "to be read using plain language that normal people on the street understand," and that "[y]ou shouldn't need a lawyer to tell you what the policy means and says when you're an insured buying it who isn't perhaps so well trained." He further opined that "I didn't think that it was a reasonable

interpretation of the language I looked at and as a result I didn't think they met the standard of care which is that all insurance companies should read plain language fairly and apply it reasonably." "The testimony of a single witness may be substantial evidence, including the testimony of an expert." (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 314.)

CCIC notes that its policy was based on a standard form prepared by The Insurance Services Office, a Connecticut company that provides standardized insurance provisions that companies may use to build insurance policies, as CCIC did in this case. According to CCIC, the company "is unaware of any other court or insurer ever arguing that [the increased-period-of restoration provision] should be interpreted in a manner that removed the 24-month limitation." According to RMB, the policy provision is unique to CCIC. But even if it were not, CCIC's argument cuts both ways. The court is unaware of any authority analyzing the provision in the way *either* party advances. So while CCIC suggests that a lack of authority means no insured has ever sought coverage in the way RMB did, it could also mean that no court has interpreted the meaning of the provision in the way that CCIC advances.

Finally, CCIC argues, largely without record citations, that there was a genuine dispute over whether it had to pay RMB's claims under the "increased period of restoration" clause since RMB did not establish it took a reasonable amount of time to construct a new complex that was of a similar quality to the one that was destroyed and that would comply with current building standards. CCIC further notes that its construction expert "concluded that the complex could have been rebuilt in 24–25 months." This is apparently a reference to the testimony of a vice president of a claims-management company's building consulting division, who testified as a

defense expert on construction timeliness, the permitting process, and related issues. RMB contends this was a "new theory for trial" and that "CCIC does not even advance its 'no coverage because the construction took too long' theory on appeal, or its other trial theories about interest, inflation, or Covid." In any event, this was a factual issue for the jury to decide, and we see no reason to set aside its verdict.

In short, CCIC falls short of carrying its appellate burden to establish that the record lacks sufficient evidence to support RMB's cause of action for breach of the implied covenant of good faith and fair dealing.

### D. CCIC Has Not Established Error in the Award of Punitive Damages, but the Award Is Constitutionally Excessive and Should Be Reduced.

Lastly, CCIC argues that the award of punitive damages should be reversed, both because it is not supported by sufficient evidence and because it was unconstitutionally excessive. We reject the first argument but agree with the second.

#### 1. CCIC fails to establish that the record lacks sufficient evidence to support the award of punitive damages.

"Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.' [Citation.] By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." (*State Farm Mut. Automobile Inc. Co. v. Campbell* (2003) 538 U.S. 408, 416 (*State Farm*).) As the jury was instructed under CACI No. 3946, "Punitive damages may be awarded only on proof by 'clear and convincing evidence' that the defendant 'has been guilty of oppression, fraud, or malice.' ([Civ. Code, ]§ 3294, subd. (a).) A finding that the defendant engaged in such conduct is reviewed under the substantial evidence standard. [Citation.] In applying that standard, we ' "view the

evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." ' " (*Mazik v. Geico General Ins. Co.* (2019) 35 Cal.App.5th 455, 462.) "The clear and convincing requirement in the trial court does not change the rule on appeal that we consider 'conflicting evidence in a light favorable to the judgment, with the presumption the trier of fact drew all reasonable inferences in support of the verdict.' [Citation.] The practical effect of this rule is that the quantum, or weight, of the evidence before the jury is not a factor for appellate review." (*Id.* at pp. 462–463.)

In a section of its opening brief that contains a single citation to a single page of the record, CCIC contends that "RMB did not come close to presenting the requisite evidence of malice, fraud, or oppression as necessary to justify the availability of punitive damages." The company again characterizes the parties' dispute as "a difference of opinion on whether relatively small and discrete amounts could be recovered under the terms of an insurance policy," once again ignoring testimony to the contrary. The company once again argues that its "interpretation of the contract" was "at least reasonable, and [was] in fact correct," an argument we already have rejected. While it might be true that it was "[t]he unequivocal testimony of *CCIC's witnesses* . . . that they paid what they genuinely believed was owed under the policy" (italics added), as CCIC argues on appeal, that does not mean the record was devoid of evidence supporting punitive damages. We agree with RMB that the question of punitive damages was one for the jury, and CCIC fails to establish error.

       2. The award of punitive damages was constitutionally excessive.

CCIC also claims that the award of punitive damages is unconstitutional because its excessiveness violates the Due Process Clause of the Fourteenth Amendment. On this point, we agree with CCIC.

"While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards." (*State Farm*, *supra*, 538 U.S. at p. 416.) "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." (*Ibid*.) "[C]ourts reviewing punitive damages [should] consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*Id.* at p. 418; see also *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 (*Simon*).) "[A]ppellate courts [must] conduct *de novo* review of a trial court's application of [these guideposts] to the jury's award. [Citation.] Exacting appellate review ensures that an award of punitive damages is based upon an ' "application of law, rather than a decisionmaker's caprice." ' " (*State Farm* at p. 418.)

In challenging the constitutionality of the award of punitive damages, CCIC focuses solely on the second guidepost identified in *State Farm*, that is, "the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." (*State Farm*, *supra*, 538 U.S. at p. 424.) " '[F]ew awards' significantly exceeding a single-digit ratio will satisfy due process to establish a type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification (by, for example,

extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause. . . . [A] ratio significantly greater than single digits 'alerts the court[] to the need for special justification.' " (*Simon*, *supra*, 35 Cal.4th at p. 1182; see also *State Farm*, *supra*, at pp. 424–425.)

The parties here disagree on the figures that should be used to consider the proportionality of the award of punitive damages. Again, jurors awarded $1,947,235 in damages on RMB's breach-of-contract claim, and on the claim for breach of the implied covenant of good faith and fair dealing they awarded $304,822 in attorney fees and $74,945.72 in prejudgment interest (a total of $379,767.72 in tort). Because Civil Code section 3294, subdivision (a), allows punitive damages only for obligation breaches "not arising from contract," courts consider the proportionality of the award of punitive damages in relation solely to the plaintiff's tort recovery. (See *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1084, disapproved on another ground in *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 382.) CCIC thus claims that we should look to the $379,767 total award in tort when assessing proportionality, which means that $6.5 million in punitive damages was "a whopping 17 times greater than the compensatory damages award." (Bold omitted.)

RMB, by contrast, contends that the trial court's award of more than $666,000 in prejudgment interest on the award of contract damages should be included in determining proportionality, meaning the ratio is actually around 6 to 1. (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 17–18 [prejudgment interest awarded by jury properly included in total for purposes of calculating ratio since it is part of the total damages suffered by plaintiff].) But we agree with CCIC that the amount of interest awarded on the breach-

of-contract claim was not awarded in connection with the tort claim and should therefore not be used in comparing the relative size of the punitive damages award. (Civ. Code, § 3294, subd. (a).) Although we will not disturb the jury's decision that punitive damages are appropriate, we are not persuaded that there is a " 'special justification' " here for a ratio of 17-to-1. (See *Simon*, *supra*, 35 Cal.4th at p. 1182.)

The question of an appropriate remedy remains. In its opening brief, CCIC relies on the principle set forth in *Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 372, that " 'ratios significantly greater than 9 or 10 to 1 are suspect and, absent special justification . . . , cannot survive appellate scrutiny under the due process clause.' " But in its opening brief, CCIC did not propose an alternative ratio or ask for remand for recalculation—it simply argued that "the punitive damages award is unconstitutional." RMB, by contrast, argues that if this court concludes that a 10-to-1 ratio is the constitutional maximum, the proper remedy is to remit the award to $3,797,677 (10 times the amount awarded in tort). For the first time in its reply brief, CCIC maintained that we "should remand the case to the trial court with instructions to reconsider the issue."

In its motion for a new trial, CCIC argued that "[n]o more than three to four times the tort damages award should be allowed" since "[r]atios of 3 or 4:1 are typically found appropriate absent egregious circumstances." At the hearing on post-trial motions, CCIC's counsel mostly focused on whether the evidence supported the award of punitive damages, and only briefly mentioned the constitutionality of the award. The trial court denied the motions without commenting on the constitutional issue (or any other issue).

We recognize that we could remand to the trial court to reassess the constitutionally allowed maximum award. (*Simon*, *supra*, 35 Cal.4th at

p. 1187.)  But given the length of litigation and the fact we may reduce the award of damages without disturbing any jury findings, "we believe the better course is for this court itself to determine the maximum punitive damages award that satisfies the constraints of due process and to order the judgment reduced accordingly." (*Ibid.*)  We "keep in mind . . . that [our] constitutional mission is only to find a level higher than which an award *may not* go; it is not to find the 'right' level in the court's own view. . . .  In enforcing federal due process limits, [we do] not sit as a replacement for the jury but only as a check on arbitrary awards." (*Id.* at p. 1188.)  Given that the jury agreed that CCIC withheld all the money RMB claimed it owed, and it did so in bad faith, we conclude under current constitutional guidance that a ratio of 10-to-1 is appropriate.

  *E. RMB Is Entitled to Its Appellate* Brandt *Attorney Fees.*

  As we have said, RMB was awarded its *Brandt* attorney fees as an element of damages.  In its respondent's brief, RMB argues that this court should award its *Brandt* fees on appeal in an amount to be determined by the trial court.  As RMB acknowledges, there is a split in authority on whether parties are entitled to recover appellate attorney fees.  (Compare *Baron v. Fire Ins. Exchange* (2007) 154 Cal.App.4th 1184, 1198 [attorney fees insured has incurred to defend judgment against insurer's appeal "are a logical extension of the fees incurred in pursuing the recovery in the trial court"] with *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 909, fn. 17 [rejecting contention that measure of *Brandt* damages includes appellate attorney fees]; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022) ¶ 14:136, p. 14-46.)  Despite the fact that this division previously has rejected such a request (*Shade Foods* at p. 909, fn. 17), CCIC does not address the issue in its reply

brief.  We agree with the reasoning of the more recently decided *Baron*, and conclude that RMB is entitled to its *Brandt* attorney fees on appeal.

## III.
### DISPOSITION

The award of punitive damages is reversed, and the matter is remanded to the trial court to reduce the award of punitive damages to $3,797,677.  The judgment is otherwise affirmed.  Each side shall bear its own appellate costs.  Respondent is entitled to its attorney fees under *Brandt*, *supra*, 37 Cal.3d 813.

_____

Humes, P. J.


WE CONCUR:



_____

Banke, J.



_____

Smiley, J.




*RMB Real Estate Investments 2, LLC v. California Capital Insurance Company*  A170466